**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BIOMODAL LIMITED and CHILDREN'S MEDICAL CENTER CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>NEW ENGLAND BIOLABS, INC.,<br><br>Defendant. | Civil Action No. 1:24-CV-11697-RGS |

**DEFENDANT NEW ENGLAND BIOLABS, INC.'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

**Page**

I.   TECHNOLOGY OVERVIEW AND THE ASSERTED PATENTS ................................. 1

     A.   Epigenetics and DNA Methylation ........................................................................ 1

     B.   The Asserted Patents ............................................................................................. 2

II.  LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................................................ 3

III. DISPUTED TERMS ........................................................................................................ 4

     A.   "label[]" .................................................................................................................. 4

     B.   "sequencing said mammalian nucleic acid comprising said labeled
         hydroxymethylated residue" or "sequencing said nucleic acid sequence" ............ 5

     C.   "TET1, TET2, TET3, CXXC4," "ten eleven translocation (TET) enzyme"
         and "TET family enzyme" ....................................................................................... 8

     D.   "a catalytic fragment of any of these" or "TET catalytically active
         fragment thereof" ................................................................................................... 14

     E.   "methylcytosine dioxygenase," "dioxygenase enzyme or fragment
         thereof" and "dioxygenase enzyme or fragment thereof that is a TET
         family enzyme or fragment thereof" ..................................................................... 17

IV.  CONCLUSION .............................................................................................................. 20

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009)................................................................................11, 13

*In re Body Sci. LLC Patent Litig.*,
   167 F. Supp. 3d 152 (D. Mass. 2016) ............................................................................13

*In re Body Sci. LLC Patent Litig.*,
   2014 U.S. Dist. LEXIS 148160 (D. Mass. Oct. 17, 2014)..............................................17

*Contech Stormwater Sols., Inc. v. Baysaver Techs., Inc.*,
   310 F. App'x 404 (Fed. Cir. 2009) ............................................................................13, 19

*EIS, Inc. v. IntiHealth Ger GmbH*,
   2023 U.S. Dist. LEXIS 8209 (D. Del. Jan. 9, 2023).......................................................12

*Halliburton Energy Servs. v. M-I LLC.*,
   514 F. 3d 1244 (Fed. Cir. 2008)......................................................................................16

*Interval Licensing LLC v. AOL, Inc.*,
   766 F. 3d 1364 (Fed. Cir. 2014)......................................................................................15

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
   383 F.3d 1295 (Fed. Cir. 2004)........................................................................................11

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009)..........................................................................................5

*Microsoft Corp. v. Multi-Tech Sys.*,
   357 F.3d 1340 (Fed. Cir. 2004)..........................................................................................7

*Milliman v. Gradient*,
   651 F. Supp. 3d 424 (D. Mass. 2023) ..........................................................................6, 16

*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007)....................................................................................7, 11

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)................................................................................3, 4, 5

*Power-One, Inc. v. Artesyn Techs., Inc.*,
   599 F.3d 1343 (Fed. Cir. 2010)..........................................................................................4

*SandBox Logistics LLC v. Proppant Express Invs. LLC*,
    813 F. App'x 548 (Fed. Cir. 2020) ...........................................................................7

*TorPharm Inc. v. Ranbaxy Pharms., Inc.*,
    336 F.3d 1322 (Fed. Cir. 2003)...............................................................................7

*Trs. of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016)...............................................................................4

Taken together, Plaintiffs' biomodal Limited ("biomodal") and Children's Medical Center Corporation ("CMCC") (together, "Plaintiffs") proposed claim constructions embody the "heads I win, tails you lose" strategy. For certain terms, Plaintiffs attempt to (loosely) tie their proposed constructions to the shared specification.[1] For others, Plaintiffs instead ask the Court to deemphasize the importance of intrinsic evidence and take Plaintiffs' word regarding the term's alleged "plain and ordinary meaning." At best, Plaintiffs' proposed constructions and purported attempts to add "clarity" result in more obtuse and confusing claims. At worst, Plaintiffs' proposed constructions directly contradict the intrinsic evidence and are fueled by after-the-fact litigation positions. Defendant New England Biolab's ("NEB") proposed constructions,[2] on the other hand, (a) adopt the meanings a person of ordinary skill in the art ("POSA") would have understood the claim terms to have in light of the intrinsic evidence, and/or (b) confirm the special meaning that Plaintiffs themselves assigned to those terms during prosecution. Plaintiffs cannot now attempt to change the meanings of the disputed claim terms to bolster their otherwise dubious infringement positions. As to each of the below disputed terms, the Court should rule for NEB.

# I.    TECHNOLOGY OVERVIEW AND THE ASSERTED PATENTS

## A.    Epigenetics and DNA Methylation

The Asserted Patents relate to the field of epigenetics – the study of how environmental and developmental factors can modify DNA and impact the function of genes (individual stretches

---

[1] Each of U.S. Patent Nos. 10,533,213 ("'213 patent"), 10,337,053 ("'053 patent"), 10,443,091 ("'091 patent"), 10,774,373 ("'373 patent"), 10,767,216 ("'216 patent") and 11,208,683 ("'683 patent") (collectively, the "Asserted Patents") claim priority to the same provisional application filed on September 26, 2008 and share substantially the same 168-page specification.

[2] In its April 14, 2024 Order (D.I. 98), the Court stated that it "defers any ruling on the parties' indefiniteness arguments until the summary judgment stage." NEB therefore reserves all rights regarding its indefiniteness positions, including with respect to the following terms proposed for construction which NEB maintains are, under any construction, indefinite: "a catalytic fragment of any of these" or "TET catalytically active fragment," "methylcytosine dioxygenase," "dioxygenase enzyme or fragment thereof," and "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof."

of DNA that contain instructions for making proteins). DNA contains four nitrogenous bases –
adenine (A), guanine (G), cytosine (C), and thymine (T) – and the order in which these bases are
arranged makes up a genetic code (or the set of instructions). Unlike a modification that alters the
order of the bases in a DNA strand (i.e., changes the instructions the DNA carries), an epigenetic
modification does not affect the order of the bases, but instead alters gene activity by changing
how the instructions of the DNA sequence are "read." Epigenetic modifications, for example, can
cause genes to turn "on" or "off" and influence the production of proteins in cells.

DNA methylation is one of the most common forms of epigenetic modification whereby a
methyl group is appended to a particular base in a DNA sequence. DNA methylation typically
turns genes "off" or reduces or halts gene activity. The most common type of cytosine methylation
in humans occurs when a methyl group is added on a cytosine in a DNA sequence creating 5-
methylcytosine ("5mC"). Similarly, the process of DNA de-methylation begins when the methyl
group is oxidized, converting 5mC to 5-hydroxymethylcytosine ("5hmC"). Ten eleven
translocation methylcytosine dioxygenase ("TET") enzymes perform this oxidation process.
Unlike DNA methylation, DNA de-methylation typically turns genes "on" – initiating gene
activity. DNA methylation and de-methylation both occur naturally in the human body and can
be a marker for a disease state, such as cancer. Therefore, identifying 5mC and 5hmC can assist
in differentiating cancerous from healthy cells.

### B.    The Asserted Patents

Plaintiffs assert that NEB infringes 54 claims across the six (6) Asserted Patents. The
Asserted Patents are part of a thicket of nearly 40 related patents and applications with overlapping
subject matter. The Asserted Patents recite similar claims – with only trivial differences in some
instances – and generally purport to be directed to "methods for regulating and detecting the
cytosine methylation status of DNA" and the observation that "the family of TET proteins, namely

TET1, TET2, TET3, and CXXC4" are "capable of converting the cytosine nucleotide 5-methylcytosine into 5-hydroxymethylcytosine by hydroxylation." *See, e.g.*, '213 patent at 1, Abstract. The subject matter of each of the Asserted Patents can generally be described as follows:

**'213 patent**: The '213 patent recites a method of detecting 5mC in a nucleic acid using a TET enzyme to oxidize the 5mC to create 5hmC and thereafter detecting the 5hmC, or glucosylating the 5hmC, creating 5ghmC, and identifying the 5ghmC.

**'053 patent**: The '053 patent recites a method including covalently labeling 5hmC in a mammalian nucleic acid, glucosylating it to create 5ghmC and sequencing the 5ghmC.

**'373 patent**: The '373 patent recites an isolated nucleic acid from an extracellular fluid containing 5ghmC and compositions comprising a nucleic acid with 5ghmC and TET.

**'216 patent**: The '216 patent recites a method comprised of a nucleic acid sequence containing both 5mC and 5hmC, labeling the 5hmC, sequencing the nucleic acid sequence and distinguishing between 5hmC and 5mC.

**'091 patent**: The '091 patent recites a method for detecting 5hmC in a nucleic acid by contacting the nucleic acid with an enzyme and utilizing a glucose substrate or glucose-derivative donor substrate to trap covalent enzyme-DNA intermediates.

**'683 patent**: The '683 patent recites a composition comprising a mixture of TET, a glucosyltransferase and a nucleic acid containing 5ghmC.

## II.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION

It is a "bedrock principle" that "the claims of a patent define the invention" and "the patentee is required to 'define precisely what his invention is.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Claim terms "are generally given their ordinary and customary meaning" and "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at

- 3 -

1312-13. Importantly, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313. In fact, "[t]he specification is always highly relevant to the claim construction analysis and is, in fact the single best guide to the meaning of a disputed term." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). The patent, including the specification and prosecution history, provide the "intrinsic evidence" and serve as the primary guide for determining the meaning of disputed claim terms. *See Phillips*, 415 F.3d at 1314; *see also See Power-One, Inc. v. Artesyn Techs., Inc.,* 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("the intrinsic evidence is the primary resource").

## III.    DISPUTED TERMS[3]

### A.    "label[]"

| Term | NEB's Construction | Plaintiffs' Construction |
|---|---|---|
| "label" | a composition capable of producing a detectable signal indicative of the presence of the target | Plain and ordinary meaning, *i.e.*, adding a molecule for downstream analysis or detection purposes. |

The Asserted Claims of the '053 and '216 patents refer to "labeling" 5hmC in methods involving sequencing nucleic acids comprising "labeled" 5hmC. The parties dispute whether the term "label[]" should be given the definition ascribed to it in the patents' specification (NEB's position) or whether the construction should be re-written to have a different meaning crafted to serve litigation positions (Plaintiffs' position). The intrinsic evidence is clear. The specification states that the term "label" as used in the Asserted Patents refers to "a composition capable of producing a detectable signal indicative of the presence of the target." '213 patent at 67:15-17.

---

[3] The order of the disputed terms presented herein varies slightly from the order of terms presented on Exhibit A to the Joint Claim Construction Statement (D.I. 97-1). The terms were reorganized for ease of the Court's reference.

Therefore, in context, "labeling" 5hmC means attaching to this molecule a composition capable of producing a detectable signal indicative of the presence of the target.  Indeed, the specification provides examples of the types of "labels" that meet this definition.  *See* '213 patent at 67:18-24.

Plaintiffs, on the other hand, ask the Court to ignore the patentees' own definition and instead, construe the term to mean "adding a molecule for downstream analysis or detection purposes," arguing that this is the plain and ordinary meaning.  The specification makes clear that labeling is not just adding "any molecule," but rather the type of molecule described and detailed in the specification.  *See* '213 patent at 67:18-24.  Even if Plaintiffs' proposed construction were in fact the plain and ordinary meaning of the term "label[]" as understood by a POSA as of the Priority Date – which NEB disputes – construing a term in accordance with its plain and ordinary meaning is inappropriate where, as here, the patentees expressly set forth a definition of the term in the specification.  *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) ("[w]hen a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls"); *see also Phillips*, 415 F.3d at 1316.  As NEB has made clear to Plaintiffs, the Accused Products do not include the "label[]" limitation as the specification defines the term.  Simply because the patentees' own definition of the term is unfavorable in the context of the Accused Products and Plaintiffs' infringement allegations, this does not justify ignoring the clear and unequivocal intrinsic evidence in favor of another definition.  Accordingly, the Court should construe the term "label[]" to mean "a composition capable of producing a detectable signal indicative of the presence of the target."

**B.    "sequencing said mammalian nucleic acid comprising said labeled hydroxymethylated residue" or "sequencing said nucleic acid sequence"**

| Term | NEB's Construction | Plaintiffs' Construction |
|------|-------------------|--------------------------|
| "sequencing said mammalian nucleic | directly sequencing the mammalian nucleic acid having | Plain and ordinary meaning, i.e., ascertaining the nucleotide |

| Term | NEB's Construction | Plaintiffs' Construction |
|------|--------------------|--------------------------|
| acid comprising said labeled hydroxymethylated residue" | a labeled hydroxymethylated residue | sequence of the modified mammalian nucleic acid in order to identify the position of the 5-hydroxymethylcytosine residue. |
| "sequencing said nucleic acid sequence" | directly sequencing the nucleic acid sequence having 5-hydroxymethylcytosine and 5-methylcytosine | Plain and ordinary meaning, i.e., ascertaining the nucleotide sequence of the nucleic acid. |

Claim 1 of both the '053 and '216 patents recite sequencing the nucleic acid sequence containing 5hmC. NEB's proposed construction of "sequencing" reflects the scope that the patentees understood "sequencing" would have as evidenced in the prosecution history. Plaintiffs' proposed construction, on the other hand, is a thinly-veiled attempt to recapture subject matter that the Examiner expressly rejected during prosecution to bolster their infringement theories.[4]

As described above, NEB's proposed constructions reflect the scope of "sequencing" that was afforded to patentees during prosecution of the '053 patent – directly sequencing the claimed nucleic acid sequence having the labeled hydroxymethylated residue. During prosecution, the applicants attempted to amend the exact claim phrase "sequencing said mammalian nucleic acid comprising said labeled hydroxymethylated residue" post-allowance to add "or an amplicon thereof," such that the claim would cover sequencing the nucleic acid sequence having the labeled hydroxymethylated residue and sequencing of "amplicons" which are DNA segments that have been artificially replicated and amplified through methods such as polymerase chain reaction (PCR) but would not preserve modifications such as a labeled hydroxymethylated residue. *See*

---

[4] Further, Plaintiffs' proposal that "sequencing" should mean "ascertaining the nucleotide sequence" adds confusion to the meaning of the claim because sequencing is a specific laboratory technique that can be used to determine the nucleic acid sequence (i.e., the order of nucleic acids in DNA) but cannot in itself "identify the position" of a modified nucleic acid such as a 5hmC residue without additional biochemical treatment. Plaintiffs vague and unsupported proposal that "sequencing" means "ascertaining" should, therefore, be rejected. *See Milliman v. Gradient*, 651 F. Supp. 3d 424, 431 (D. Mass. 2023) (rejecting a plaintiff's construction as ambiguous and finding it would have resulted in "confusion for the jury.").

Ex. 1.  The Examiner expressly rejected the proposed amendment stating that such amendment would "broaden the scope of the claim as step (b) would not depend on the performance of step (a)."  *Id*.  Rather than further contest the rejection, the applicants let the claims proceed to issuance without the added "amplicons" limitation.  Plaintiffs' proposed construction attempts to re-claim in litigation what the patent applicant gave up during prosecution.

As the Federal Circuit instructs, "[w]hether the patentee chooses to dispute the examiner's view of matters is relevant to claim interpretation." *TorPharm Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003).  "[I]n ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest.  Such acquiescence may be found where the patentee narrows his or her claims by amendment . . . or lets stand an examiner's restrictive interpretation of a claim."  *Id*.; *see also SandBox Logistics LLC v. Proppant Express Invs. LLC*, 813 F. App'x 548, 554 (Fed. Cir. 2020).  Here, the fact that the Examiner rejected the patentees' attempt to expand the breadth of claim 1 of the '053 patent to cover amplicons (i.e., broader than sequencing the nucleic acid itself) and the patentees let the claims issue without such breadth precludes Plaintiffs from reclaiming that scope through claim construction.  *See id*.

Additionally, even though the "amplicons" dispute occurred during the '053 patent prosecution history and the claim phrase "sequencing said nucleic acid sequence" appears in claim 1 of the '216 patent, as noted above, the Asserted Patents are all part of the same patent family and purport to claim priority to a single provisional application.  It therefore is appropriate for the Court to refer to the '053 patent prosecution history when construing this term as the Federal Circuit has made clear "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application."  *See Microsoft*

*Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004); *see also Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007). Thus, the Court should construe "sequencing said mammalian nucleic acid comprising said labeled hydroxymethylated residue" to mean "directly sequencing the mammalian nucleic acid having a labeled hydroxymethylated residue" and "sequencing said nucleic acid sequence" to mean "directly sequencing the nucleic acid sequence having 5-hydroxymethylcytosine and 5-methylcytosine."

## C. "TET1, TET2, TET3, CXXC4," "ten eleven translocation (TET) enzyme" and "TET family enzyme"

| Term | NEB's Construction | Plaintiffs' Construction |
|---|---|---|
| TET1, TET2, TET3, CXXC4 | the sequences of human TET1, TET2, TET3, and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins | "TET1, TET2, TET3, CXXC4" refers to a TET family protein which, as disclosed in the patent, refers to "the sequences of human TET1, TET2, TET3, and CXXC4, and to proteins having at least 70%. . . homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating [/oxidizing]) activity of the TET family of proteins." '213 patent 14:59-65.<br><br>For clarity, TET1, TET2, TET3, CXXC4 are not limited to human, and include, for example, murine TET1, TET2, and TET3. *See* '213 patent, '83:28-31 ("The mouse genome expresses three family members–Tet1, Tet2 and Tet3—that share significant sequence homology with the human homologs (FIG 14A)"). |
| ten eleven translocation (TET) enzyme | the sequences of human TET1, TET2, TET3, and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins | Plain and ordinary meaning, i.e., a protein having the catalytic activity of a TET family protein. |

| Term | NEB's Construction | Plaintiffs' Construction |
|---|---|---|
| TET family enzyme | the sequences of human TET1, TET2, TET3, and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins | A TET family enzyme is a TET family protein which, as disclosed in the patent, "refers to the sequences of human TET1, TET2, TET3, and CXXC4, and to proteins having at least 70% . . . homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating [/oxidizing]) activity of the TET family of proteins." '213 patent 14:59-65. |

Each of "TET1, TET2, TET3, CXXC4," "ten eleven translocation (TET) enzyme," and "TET family enzyme" refer to the enzymes that catalyze the conversion or oxidation of 5mC to 5hmC. The crux of the parties' dispute as to these three terms is whether they should be limited to the specification definition of "TET family protein" (NEB's position) or whether they should be construed to cover other unknown and undefined proteins (Plaintiffs' position). NEB proposes that these terms be construed the same to mirror the way the specification consistently depicts and describes TET enzymes – as TET family proteins, which the specification defines as "the sequences of human TET1, TET2, TET3, and CXXC4, and [] proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins." '213 patent at 14:59-14:65.[5] Plaintiffs' proposed constructions, on the other hand, reference the specification definition of TET family proteins, but inject unnecessary and unsupported ambiguity in a blatant attempt to bolster infringement allegations. For example, Plaintiff's offered construction for "TET1, TET2, TET3, CXXC4" includes a statement to "add

---

[5] For the avoidance of doubt and as NEB represented during preliminary injunction briefing, a POSA would understand the statement in the specification's definition of "TET family protein" of "having at least 70% . . . homology" to mean 70% sequence identity. *See* D.I. 60 at 6 n.7.

clarity" that has the effect of providing two contradictory constructions.  As described below, NEB's proposed construction should be adopted and Plaintiffs' positions should be rejected.

NEB proposes that the terms "TET1, TET2, TET3, CXXC4," "ten eleven translocation (TET) enzyme," and "TET family enzyme" be construed the same way to align with the intrinsic evidence, which consistently focuses on TET family proteins when referencing enzymes that convert 5mC to 5hmC, i.e., human TETI, TET2, TET3 and CXXC4 and proteins with 70% homology to human TET1, TET2 or TET3.  *See, e.g.*, '213 patent at 12:29-33, 26:57-63.  Indeed, the specification expressly states that "[t]he invention is based upon identification [of an] enzymatic activity for the family of TET proteins, namely TETI, TET2, TET3, and CXXC4." '213 patent at 12:27-29; *see also* 14:47-50 ("[t]he TET family of proteins as referred to in . . . all aspects and embodiments described herein in this application, comprises the nucleotide sequences of TETI, TET2, TET3, and CXXC4").  In fact, the specification identifies TET family proteins as the enzymes that perform this enzymatic activity and convert 5mC to 5hmC.  *See* '213 patent at 12:29-33 (the "enzymatic activity relates to the conversion of the cytosine nucleotide [5mC] into [5hmC] via a process of hydroxylation by the TET family of proteins").  Further, the specification uses the terms TET1, TET2, TET3, CXXC4, TET family enzyme and TET family protein interchangeably when illustrating this process.  *See* '213 patent at 26:57-63 ("[t]he invention is based, in part, upon . . . the identification . . . activity for the **family of TET proteins**, namely **TET1, TET2, TET3, and CXXC4**.  [This] activity is related to the hydroxylase activity of the **TET family enzymes**, wherein the hydroxylase activity converts the cytosine nucleotide [5mC] into [5hmC]").

Additionally, during prosecution of related U.S. Patent No. 10,731,204, which shares the same specification with the Asserted Patents and also recites the TET1, TET2, TET3, CXXC4 claim term, the Examiner confirmed that "[t]he instant specification does not describe any other

enzymes, outside of the family of Tet proteins (i.e. TET1, TET2, TET3 and CXXC4), that can carry out the claimed reaction of converting methylcytosine to a hydroxymethylated cytosine." Ex. 2 at 4; *see also Ormco Corp.*, 498 F.3d at 1314 ("statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed" are relevant in claim construction). This statement endorses that NEB's proposed constructions honor the specific and crucial element touted in the claimed inventions – TET family proteins' conversion of 5mC to 5hmC – even if different words are sometimes used to describe the same thing. For the reasons described above, the specification definition of TET family proteins and consistent focus on TET family proteins reflect a clear intent to limit TET1, TET2, TET3, CXXC4, ten eleven translocation (TET) enzyme, and TET family enzyme recited in the claims to TET family proteins as that term is defined in the specification. *See, e.g.*, '213 patent at 14:59-14:65. It is therefore appropriate for the Court to construe the terms accordingly. *See Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004) ("while the specification does not contain any statements of explicit disavowal or words of manifest exclusion, it repeatedly, consistently, and exclusively uses 'group' to denote fewer than all subscribers, manifesting the patentee's clear intent to so limit the term"); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1290-91 (Fed. Cir. 2009) (affirming limitation of the claim term "crystalline" to "Crystal A" because: (i) Crystal A was the only described embodiment; and (ii) the intrinsic evidence evinced a clear intent to limit the patent to Crystal A).

While Plaintiffs' construction of "TET1, TET2, TET3, CXXC4" at first glance appears to align with the specification definition of TET family protein in that it adopts "the sequences of human TET1, TET2, TET3, and CXXC4, and to proteins having at least 70% . . . homology to human TET1, TET2, or TET3," Plaintiffs add a further purportedly explanatory paragraph that

- 11 -

directly contradicts their initial proposed construction.[6]  Ironically, Plaintiffs' second paragraph added "for clarity" states "TET1, TET2, TET3, CXXC4 are not limited to human, and include, for example murine TET1, TET2, and TET3."  As an initial matter, Plaintiffs' "for clarity" statement indicates that, contrary to their offered construction, at least 70% homology to human TET1, TET2, or TET3 is no longer required.  Moreover, the only reference to non-human TET in the specification is to full-length, naturally occurring murine (mouse) TET proteins, but Plaintiffs' proposed "for clarity" construction appears to cover any mouse TET (including variants or fragments), along with any other undefined or undisclosed TET, regardless of whether the enzymes share 70% homology to human TET1, TET2, or TET3 or display the catalytic activity of TET family proteins.  Plaintiffs' attempt to add "clarity" is, rather, an improper attempt to broaden the scope of the claims to include non-human TET, such as those that are from other species or yet unknown, that may or may not be 70% homologous to human TET1, TET2, or TET3.  *See EIS, Inc. v. IntiHealth Ger GmbH*, 2023 U.S. Dist. LEXIS 8209, at *50 (D. Del. Jan. 9, 2023) (finding proposed construction "masquerade[d] as a genuine attempt to promote clarity" but was "ultimately fueled" by litigation positions "unsupported by the intrinsic record.").  The specification, however, specifies a threshold homology to human TET1, TET2, and TET3 that a "TET family protein" must have, as Plaintiffs acknowledge.  At bottom, Plaintiffs offer two distinct (and inconsistent) constructions under the guise of further clarification.  This is procedurally improper, confusing and should be rejected.

Lastly, Plaintiffs assertion that "a ten eleven translocation (TET) enzyme" should be construed as "plain and ordinary meaning, i.e., a protein having the catalytic activity of a TET family protein" improperly contorts the meaning of the term and is unsupported by any evidence.

---

[6] Plaintiffs' added "for clarity" statement is not included in Plaintiffs' offered construction of TET family enzyme.

The term "a ten eleven translocation (TET) enzyme" does not appear anywhere in the specification. As described above, the specification does not identify any other proteins that catalyze the oxidation of 5mC to 5hmC besides the disclosed TET proteins, and focuses specifically on TET family proteins. A ten eleven translocation (TET) enzyme should thus be construed in the same manner as TET1, TET2, TET3, CXXC4 and TET family enzyme. *See Abbott Labs.*, 566 F.3d at 1290-91. Plaintiffs' proposed construction provides no further insight into what exactly any other "protein having the catalytic activity of a TET family protein" might be. Given that Plaintiffs' proposed construction is untethered to the specification and is confusingly broad, it should be rejected. *See In re Body Sci. LLC Patent Litig.*, 167 F. Supp. 3d 152, 160 (D. Mass. 2016) (rejecting construction as "overbroad" and "not naturally align[ed] with the patents' description of the inventions"); *see also Contech Stormwater Sols., Inc. v. Baysaver Techs., Inc.*, 310 F. App'x 404, 407 (Fed. Cir. 2009) (finding plaintiff was "not entitled to a claim construction divorced from the context of the intrinsic evidence."). The Court should construe TET1, TET2, TET3, CXXC4, ten eleven translocation (TET) enzyme, and TET family enzyme consistent with the specification to mean "the sequences of human TET1, TET2, TET3, and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins."

**D.    "a catalytic fragment of any of these" or "TET catalytically active fragment thereof"**

| Term | NEB's Construction | Plaintiffs' Construction |
|---|---|---|
| "a catalytic fragment of any of these"<br><br>OR<br><br>"TET catalytically active fragment thereof" | Indefinite.  Alternatively, if the term was to be given a construction, it should be construed as "a catalytic fragment of TET1, TET2, TET3, or CXXC4 which has (1) a sequence identical or having at least 70% identity to SEQ ID NO: 2; or (2) a sequence having a linear succession of SEQ ID NO:2, SEQ ID NO: 3 and SEQ ID NO: 4" | The "catalytic fragment" of these claim phrases, as disclosed in the patent, means: "A 'TET catalytically active fragment' which the patent specification defines as 'compris[ing] a protein having a catalytic activity of TET family proteins and a sequence meeting one of the following criteria: (1) Identical to the sequence of SEQ ID NO: 2 or one of the empirically verified catalytic fragments; or having homology of at least 70% . . . to' SEQ ID NO: 2 or one of the empirically verified catalytic fragments; "or (2) incorporating a linear succession of the TET signature sequences of SEQ ID NO: 2, SEQ ID NO: 3, and SEQ ID NO: 4 in a defined order, that are predicted to form the core of the beta-stranded double helix catalytic domain; or having homology of at least 70% . . . to such a linear succession of TET family signature sequences, and preserving the linear order thereof." '213 patent, 15:6-33. |

Certain of the Asserted Claims recite that a TET enzyme or "catalytic fragment" of such TET enzyme oxidize 5mC to 5hmC.  *See* '213 patent, claim 1; '091 patent, claim 5.  The specification, however, provides little guidance on the criteria for a "catalytic fragment" or what the term encompasses – especially in light of the ambiguous definition of "TET catalytically active fragment" offered by Plaintiffs.  While NEB maintains that the claim terms "a catalytic fragment of any of these" and "TET catalytically active fragment thereof" are indefinite under any construction, NEB's proposed construction attempts to streamline and add clarity to these otherwise nebulous terms.  Plaintiffs' proposed construction instead recites the specification definition of "TET catalytically active fragment" and includes the phrase an "empirically verified

catalytic fragment" which, as described below, is ambiguous and lacks clarity.  *See* '213 patent at 15:6-21.  While NEB agrees that, in most circumstances, a specification definition is instructive for claim construction, there are unique reasons why the specification definition does not work here.  In this instance, the definition provides no insight into the scope and meaning of an "empirically verified catalytic fragment"[7] and confusingly imports a seemingly duplicative aspect of "catalytic activity" by reciting another defined term ("TET family proteins") in the construction.  *See* '213 patent at 14:59-15:2; *See Interval Licensing LLC v. AOL, Inc.*, 766 F. 3d 1364, 1371 (Fed. Cir. 2014) ("that [patentee] can articulate a definition supported by the specification . . . does not end the inquiry" if the term does not have a meaningful scope to a POSA).

NEB's proposed construction is clear and concise: "a catalytic fragment of TET1, TET2, TET3, or CXXC4 which has (1) a sequence identical or having at least 70% identity to SEQ ID NO: 2; or (2) a sequence having a linear succession of SEQ ID NO:2, SEQ ID NO: 3 and SEQ ID NO: 4."  Further, NEB's construction lends credence to the specification depiction of catalytic fragments, but is clearer and more aligned with the specific focus in the intrinsic evidence on catalytic fragments of TET family proteins (i.e., TET1, TET2, TET3, or CXXC4).  *See, e.g.*, '213 patent 4:66-67 ("In one embodiment, only a TETI, TET2, TET3, or CXXC4 catalytic fragment is used"); 9:21.  Indeed, the prosecution history supports this focus on catalytic fragments of TET1, TET2, TET3, or CXXC4.  During prosecution of the '213 patent, the Examiner concluded the claim that recites the "catalytic fragment of any of these" limitation required "oxidizing [5mC] residues in a nucleic acid. . . by contacting the nucleic acid with: . . . a catalytic fragment of TET1, TET2, TET3 or CXXC4 . . ."  Ex. 3 at 3.

---

[7] As described in further detail below, the phrase "empirically verified catalytic fragment" appears only once in the specification.  *See* '213 patent at 15:10.  Due to the lack of guidance in the specification on the properties that can be used to "verify," a POSA would not understand how to assess, or what assays to use to assess, an "empirically verified catalytic fragment," such that a POSA would not know what fragments are encompassed by this term.

Aside from length (NEB's 34 words v. Plaintiffs' 118 words), the main differences between NEB's proposed construction and Plaintiffs', as noted above, are that NEB's proposed construction does not refer to "one of the empirically verified catalytic fragments" and does not cite within it another defined term that recites its own "catalytic activity."[8]  As to the first issue, this is because the specification does not provide any parameters for what an "empirically verified fragment" is or how one is created and only uses the term once – in the definition of "TET catalytically active fragment."  A POSA, therefore, would not understand with reasonable certainty what an "empirically verified catalytic fragment" is and, in fact, including the term in the construction renders it indefinite.  *See Halliburton Energy Servs. v. M-I LLC.*, 514 F. 3d 1244, 1251 (Fed. Cir. 2008) ("The fact that [the patent holder] can articulate a definition supported by the specification, however, does not end the inquiry . . . the claim is still indefinite if a [POSA] cannot translate the definition into meaningfully precise claim scope.")

Second, Plaintiffs' proposed construction incorporates another defined term referring to catalytic activity – TET family protein – within the construction rendering it vague and confusing. Specifically, Plaintiffs' proposed construction includes the preamble "compris[ing] a protein having a catalytic activity of TET family proteins."  The specification defines a "TET catalytically active fragment" as comprising "a protein having a catalytic activity of TET family proteins" as noted in Plaintiffs' construction. '213 patent at 15:6-21.  The specification also, however, defines a "TET family protein" as "displaying a catalytic (hydroxylating) activity of the TET family of proteins." *Id.*, at 14:60-65.  Reading these definitions together, the specification does not provide

---

[8] NEB's proposed construction also removes the portion of the TET catalytically active fragment definition that states "in a defined order, that are predicted to form the core of the beta-stranded double helix catalytic domain; or having homology of at least 70% . . . to such a linear succession of TET family signature sequences, and preserving the linear order thereof" as this language is ambiguous and would add more confusion than clarity. *See Milliman*, 651 F. Supp. at 431.  Particularly, it is unclear what "a defined order" means – is it in the order the sequences are provided, *i.e.* SEQ ID NO 2, followed by SEQ ID NO: 3 and SEQ ID NO: 4, or in some other order? The specification is otherwise silent on "a defined order."

*any* guidance as to how "a catalytic activity of TET family proteins" in a catalytic fragment differs, if at all, from "a catalytic (hydroxylating) activity of the TET family of proteins" in TET family protein or how those terms should be read together. *Id.*, at 14:64-65. Proposed constructions that are "more likely to create confusion than clarity" should be rejected. *See In re Body Sci. LLC Patent Litig.*, 2014 U.S. Dist. LEXIS 148160, at \*29 (D. Mass. Oct. 17, 2014). Accordingly, the Court should construe "a catalytic fragment of any of these" and "TET catalytically active fragment thereof" to mean "a catalytic fragment of TET1, TET2, TET3, or CXXC4 which has (1) a sequence identical or having at least 70% identity to SEQ ID NO: 2; or (2) a sequence having a linear succession of SEQ ID NO:2, SEQ ID NO: 3 and SEQ ID NO: 4."

      **E.** **"methylcytosine dioxygenase," "dioxygenase enzyme or fragment thereof" and "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof"**

| Term | NEB's Construction | Plaintiffs' Construction |
|------|--------------------|--------------------------|
| methylcytosine dioxygenase | Indefinite. Alternatively, if the term was to be given a construction, it should be construed as "the sequences of human TET1, TET2, TET3, and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins" | Plain and ordinary meaning i.e., a protein that catalyzes the hydroxylation/oxidation of 5-methylcytosine to 5-hydroxymethylcytosine. |
| dioxygenase enzyme or fragment thereof | Indefinite. Alternatively, if the term was to be given a construction, it should be construed as "the sequences of human TET1, TET2, TET3, and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins" | Plain and ordinary meaning, i.e., a protein that catalyzes the hydroxylation/oxidation of 5-methylcytosine to 5-hydroxymethylcytosine. |
| dioxygenase enzyme or fragment thereof | Indefinite. Alternatively, if the term was to be given a construction, it should be construed as "the sequences of human TET1, TET2, TET3, | Plain and ordinary meaning, i.e., a protein that catalyzes the hydroxylation/oxidation |

| Term | NEB's Construction | Plaintiffs' Construction |
|---|---|---|
| that is a TET family enzyme or fragment thereof | and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins" | of 5-methylcytosine to 5-hydroxymethylcytosine, which is a "TET family enzyme" (construction No. 9) or a TET "catalytically active fragment" (construction No. 1). |

TET enzymes are species of the genus of "methylcytosine dioxygenase" which itself is a species of the broader genus of "dioxygenase enzyme." The main dispute between the parties on "methylcytosine dioxygenase," "dioxygenase enzyme or fragment thereof" and "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof" is whether the terms should be limited to the disclosed TET family proteins (NEB's position) or if they should be interpreted to cover other undisclosed and unknown enzymes (Plaintiffs' position). The term "methylcytosine" is never used or mentioned in the specification and "dioxygenase" is only referred to twice in 168 pages. *See* '213 patent at 74:40, 82:4. Although indefinite under any construction, NEB's proposed construction of these disputed terms is consistent with the focus of the intrinsic record on the disclosed TET proteins as the enzymes that perform the enzymatic oxidation of 5mC to 5hmC. *See supra* pp. 8-13. Plaintiffs' proposed constructions of "methylcytosine dioxygenase" and "dioxygenase enzyme or fragment thereof" are instead defined by function and reflect an attempt to expand these terms to cover any possible protein that "catalyzes the hydroxylation/oxidation" of 5mC to 5hmC.[9] As the Examiner noted during prosecution of the related '204 patent, however, "[t]he instant specification does not describe any other enzymes, outside of the family of Tet proteins (i.e. TET1, TET2, TET3 and CXXC4), that can carry out the claimed reaction of converting methylcytosine to a hydroxymethylated cytosine." Ex. 2 at 4. As the Examiner recognized, the specification provides no insight on any other proteins,

---

[9] Plaintiffs' seemingly boundless proposed constructions further emphasize why these terms are indefinite.

including any other TET proteins that are undisclosed, that perform the oxidation of 5mC to 5hmC. Plaintiffs' attempt to obtain an overly broad construction should be rejected.

NEB's proposed constructions for "methylcytosine dioxygenase," "dioxygenase enzyme or fragment thereof" and "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof" are consistent with the focus in the intrinsic record on TET family proteins. *See supra* pp. 8-13.  If these terms were interpreted to cover proteins *other* than the disclosed TET family proteins, the specification provides no insight or guidance into what else these terms could mean.    Indeed,  the  specification  does  not  disclose  any  other  types  of  "methylcytosine dioxygenases" or "dioxygenase enzymes" that oxidize 5mC to 5hmC besides the disclosed TET proteins.  As noted above, during prosecution of the related '204 patent, the Examiner agreed and recognized "[t]he instant specification," which is the same specification as the '213 patent, "does not describe any other enzymes, outside of the family of Tet proteins (i.e. TET1, TET2, TET3 and CXXC4),  that  can  carry  out  the  claimed  reaction  of  converting  methylcytosine  to  a hydroxymethylated cytosine."  *See* Ex. 2 at 4.  Plaintiffs' effort to obtain a construction untethered to the specification so as to cover *any* enzyme that may catalyze the conversion of 5mC to 5hmC should be rejected.  *See Contech Stormwater Sols.*, 310 F. App'x at 407 (rejecting overbroad construction "divorced from the context of the intrinsic evidence.").

Lastly, Plaintiffs' proposed construction of "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof" further evidences Plaintiffs' improper attempt to secure overbroad constructions for "methylcytosine dioxygenase" and "dioxygenase enzyme or fragment thereof."  Plaintiffs propose construing this term to mean "a protein that catalyzes the hydroxylation/oxidation of 5-methylcytosine to 5-hydroxymethylcytosine, which is a 'TET family

enzyme' (construction No. 9) or a TET 'catalytically active fragment' (construction No. 1)."[10] This definition, however, implies that "methylcytosine dioxygenase" or "dioxygenase enzyme or fragment thereof" covers proteins **other than** TET family enzymes or TET catalytically active fragments. As described above, the specification does not identify any other enzyme that catalyzes the oxidation of 5mC to 5hmC besides the disclosed TET enzymes. *See supra* pp. 10-11. Plaintiffs should not be entitled to constructions of undefined scope. Accordingly, "methylcytosine dioxygenase," "dioxygenase enzyme or fragment thereof" and "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof" should be construed as "the sequences of human TET1, TET2, TET3, and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins."

## IV.    CONCLUSION

For the reasons set forth above, the Court should find in favor of NEB as to all the disputed claim terms.

---

[10] Plaintiffs' construction of "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof" incorporates their proposed constructions of "dioxygenase enzyme or fragment thereof," "TET family enzyme" and "TET catalytically active fragment." For the same reasons, Plaintiffs' construction of "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof" should be rejected. *See supra* pp. 8-17.

Respectfully submitted,

NEW ENGLAND BIOLABS, INC.
By its attorneys,


/s/ *Michael H. Bunis*
Michael H. Bunis (BBO No. 566839)
Anita M. C. Spieth (BBO No. 676302)
Bryana T. McGillycuddy (BBO No. 684990)
Jillian L. Gately (BBO No. 703437)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel.: (617) 248-5000
Fax: (617) 248-4000
mbunis@choate.com
aspieth@choate.com
bmcgillycuddy@choate.com
jgately@choate.com

Dated: April 25, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants.

*/s/ Michael H. Bunis*

Dated: April 25, 2025