UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 24-11697-RGS

BIOMODAL LIMITED and CHILDREN'S
MEDICAL CENTER CORPORATION

v.

NEW ENGLAND BIOLABS, INC.

MEMORANDUM AND ORDER ON
CLAIM CONSTRUCTION

August 12, 2025

STEARNS, D.J.

Plaintiffs biomodal Limited (biomodal) and Children's Medical Center Corporation (CMCC) accuse defendant New England Biolabs, Inc. (NEB) of infringing several claims of United States Patent Nos. 10,533,213 B2 (the '213 patent); 11,208,683 B2 (the '683 patent); 10,337,053 B2 (the '053 patent); 10,774,373 B2 (the '373 patent); 10,443,091 B2 (the '091 patent), and 10,767,216 B2 (the '216 patent). Before the court now are the parties' briefs on claim construction. Having heard argument pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), on July 29, 2025, the court will construe the nine disputed terms as follows.

## THE PATENTS

Epigenetics is the study of changes in gene expression that are not encoded in DNA – in other words, how environmental and behavioral factors impact the function of genes without altering the underlying sequence of the DNA. One of the most common epigenetic modifications is the methylation of DNA. This is often performed by using 5-azacytidine, one of the several analogs for the compound nucleoside cytidine, to create 5-methylcytosine (5mC). 5mC may be further oxidized into 5-hydroxymethylcytosine (5hmC).

5mC and 5hmC occur naturally and are often associated with diseases like cancer, making detection and quantification of these modifications medically significant. The asserted patents, which share substantially the same specification and claim priority to the same provisional application,[1] address this issue. They are directed to "novel methods for regulating and detecting the cytosine methylation status of DNA" using the "catalytic activity for the family of TET proteins" – *i.e.*, the ability of these enzymes to "convert[]" 5mC into 5hmC "by hydroxylation." '213 patent, col. 3, ll. 53-60; *see also id.*, col. 1, ll. 36-38; *id.*, col. 12, ll. 26-33.

---

[1] Consistent with the parties' briefing, the court will cite only to the specification of the '213 patent unless a meaningful difference exists among various of the patents.

The parties dispute the following nine claim terms:[2]

- "a catalytic fragment of any of these" or "TET catalytically active fragment thereof"

- "TET1, TET2, TET3, CXXC4"

- "label[]"

- "sequencing said mammalian nucleic acid comprising said labeled hydroxymethylated residue" or "sequencing said nucleic acid sequence"

- "methylcytosine dioxygenase"

- "dioxygenase enzyme or fragment thereof"

- "a ten eleven translocation (TET) enzyme"

- "a TET family enzyme"

- "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof"

## DISCUSSION

Claim construction is a matter of law. *See Markman*, 517 U.S. at 388-389. Claim terms "are generally given [the] ordinary and customary meaning" that would have been ascribed by "a person of ordinary skill in

---

[2] The parties initially disputed an additional term – "utilizing a glucose donor substrate or a glucose-derivative donor substrate that traps covalent enzyme-DNA intermediate" – but they have since agreed upon the construction "utilizing a glucose donor substrate to trap covalent enzyme-DNA intermediaries or a glucose-derivative donor substrate to trap covalent enzyme-DNA intermediaries." *See* Pls.' Opening Br. [Dkt # 99] at 14. The court accordingly does not address this term.

3

the art in question at the time of the invention."[3] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005) (en banc), quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). In determining how a person of ordinary skill in the art would have understood the claim terms at the time of the invention, the court looks to the specification of the patent, its prosecution history, and, in limited instances where appropriate, extrinsic evidence such as dictionaries, treatises, or expert testimony. *Philips*, 415 F.3d. at 1315-1317. Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316, quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

### *"a catalytic fragment of any of these" or "TET catalytically active fragment thereof"*

The parties agree that the patentee acted as his own lexicographer and defined "TET catalytically active fragment" as

> a protein having a catalytic activity of TET family proteins and a sequence meeting one of the following criteria: (1) Identical to the sequence of SEQ ID NO: 2 or one of the empirically verified catalytic fragments; or having homology of at least 70%, at least

---

[3] The parties' experts agree that a skilled artisan would have a Ph.D. in a related epigenetic field and at least five years of laboratory experience. *See* Carell. Decl. [Dkt # 99-1] ¶¶ 22; Meissner Decl. [Dkt # 36] ¶ 32.

4

> 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, to such a sequence or (2) incorporating a linear succession of the TET signature sequences of SEQ ID NO: 2, SEQ ID NO: 3, and SEQ ID NO: 4 in a defined order, that are predicted to form the core of the beta-stranded double helix catalytic domain; or having homology of at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, to such a linear succession of TET family signature sequences, and preserving the linear order thereof.

'213 patent, col. 15, ll. 6-21; *see Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (a patentee may act as his own lexicographer so long as he "'clearly set[s] forth a definition of the disputed claim term' other than its plain and ordinary meaning"), quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *Parkervision, Inc. v. Vidal*, 88 F.4th 969, 976 (Fed. Cir. 2023) ("The patentee's use of the phrases 'as used herein' and 'refer to' conveys an intent for sentence 5 to be definitional."). Defendant nonetheless asks the court to adopt an alternative, streamlined construction: "a catalytic fragment of TET1, TET2, TET3, or CXXC4 which has (1) a sequence identical or having at least 70% identity to SEQ ID NO: 2; or (2) a sequence having a linear succession of SEQ ID NO: 2, SEQ ID NO: 3, and SEQ ID NO: 4."

To the extent defendant removes the phrases "empirically verified catalytic fragments" and "linear sequence of the TET signature sequences . . . in a defined order," '213 patent, col. 15, ll. 6-21, in its proposed streamlined

construction, the court rejects the change. Defendant does not cite to any evidence in the intrinsic record indicating that the words are superfluous. It premises the omission solely on alleged ambiguity as to the meaning of "empirically verified catalytic fragments" and "linear sequence of the TET signature sequences . . . in a defined order." *See* Def.'s Opening Br. [Dkt # 101] at 16; Def.'s Resp. Br. [Dkt # 104] at 15. Concerns about ambiguity, however, are more properly addressed to indefiniteness rather than claim construction; they do not provide any basis for the court to unilaterally ignore the patentee's intended definition.

The court similarly rejects defendant's attempt to replace "a protein having a catalytic activity of TET family proteins" with "a catalytic active fragment of TET1, TET2, TET3, or CXXC4." It is clear from the specification that the term incorporates not just "the sequences of human TET1, TET2, TET3, and CXXC4," as defendant proposes, but also "proteins having at least 70% . . . homology to human TET1, TET2, or TET3." '213 patent, col. 14, ll. 59-63.

There is merit, however, to the replacement of "homology" with "identity." The specification defines a "TET catalytically active fragment" as having a sequence that is either "[i]dentical to the sequence of SEQ ID NO: 2 or one of the empirically verified catalytic fragments" ***or*** "ha[s] homology of

6

at least 70% . . . to such a sequence." *Id.*, col. 15, ll. 9-13. Homology is measured with respect to a sequence in this definition, and the measurement serves as a counterpoint to complete sequence identicality, indicating that the patentee viewed the terms as addressing the same basic concept: degree of sequence identity. This interpretation is bolstered by the patentee's references to "significant sequence homology" between murine TET enzymes and human TET enzymes. *See id.*, col. 10, ll. 19-21; *id.*, col. 83, l. 30.

The court also finds it significant that, when homology is measured against something less than the full sequence (e.g., only the catalytically active parts of a TET protein), the patentee expressly states so. The specification, for example, defines "functional TET family derivative" as "a protein comprising a signature sequence, SEQ ID NO: 1, ***from the catalytic site*** of the TET family proteins." *Id.*, col. 14, l. 65-col. 15, l. 2 (emphasis added). And when later predicting that mammalian TET enzymes "belong to the class of enzymes containing 2OG-Fe(II) oxygenase domains," the specification describes using the "predicted oxygenase domains of JBP1 and JBP2" – *i.e.*, less than the full JBP1 and JBP2 sequences – to find "homologous ***regions*** in three paralogous human proteins." *Id.*, col. 73, ll. 5-7 (emphasis added). The patentee clearly knew how to limit the scope of sequence comparison when he desired to do so.

7

Attempting to find recourse, plaintiffs turn to the declaration of their expert, Thomas Carell. Sources extrinsic to the patent, however, cannot be used to import limitations where "the appropriate definition can be ascertained from the specification." *See Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1305 (Fed. Cir. 2015); *see also Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007) ("When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term."), quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998).

The court accordingly construes "a catalytic fragment of any of these" or "TET catalytically active fragment thereof" as "a protein having a catalytic activity of TET family proteins and a sequence meeting one of the following criteria: (1) Identical to the sequence of SEQ ID NO: 2 or one of the empirically verified catalytic fragments; or having identity of at least 70% to SEQ ID NO: 2 or one of the empirically verified catalytic fragments; or (2) incorporating a linear succession of the TET signature sequences of SEQ ID NO: 2, SEQ ID NO: 3, and SEQ ID NO: 4 in a defined order, that are predicted to form the core of the beta-stranded double helix catalytic domain; or having

8

identity of at least 70% to such a linear succession of TET family signature sequences, and preserving the linear order thereof."

### *"TET1, TET2, TET3, CXXC4" or "a TET family enzyme"*

The parties agree that the terms "TET1, TET2, TET3, CXXC4" and "a TET family enzyme" are synonymous with "TET family protein," which as noted above, the specification defines as "the sequences of human TET1, TET2, TET3, and CXXC4," and "proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of proteins." '213 patent, col. 14, ll. 59-65. They disagree, however, as to what "homology" means within the definition.[4] For the reasons noted above, the court agrees with defendant that "homology" means "sequence identity."

### *"a ten eleven translocation (TET) enzyme"*

Plaintiffs propose that the court construe "a ten eleven translation (TET) enzyme" as "a protein having the catalytic activity of a TET family

---

[4] It is not entirely clear to the court whether the parties dispute which proteins (human or non-human) fall within the scope of "TET1, TET2, TET3, CXXC4" or "a TET family enzyme." To the extent they do, the court relies on the plain text of the definition to find that it encompasses human TET1, TET2, TET3, and CXXC4 and proteins (human *or* non-human) having at least 70% homology to human TET1, TET2, or TET3.

protein." Defendant argues that the term is synonymous with "TET family protein," "TET1, TET2, TET3, CXXC4," and "a TET family enzyme," and thus should similarly be construed as "the sequences of human TET1, TET2, TET3, and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of protein."

At its core, the dispute between the parties is whether "a ten eleven translation (TET) enzyme" encompasses non-human TET enzymes which lack a homology of at least 70% with human TET1, TET2, or TET3. Plaintiffs rely on the doctrine of claim differentiation to argue that it does, noting that any construction of "a ten eleven translation (TET) enzyme" to the contrary would render claim 3 – which recites "TET1, TET2, TET3, CXXC4" – redundant. Pls.' Opening Br. at 19; Pls.' Resp. Br. [Dkt # 106] at 19; *see Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). But claim differentiation "is not a hard and fast rule." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). The presumption it creates may be "overcome" where the intrinsic record demands "a contrary construction." *Id.*

10

Here, the court finds the presumption rebutted. Plaintiffs do not point the court to any disclosure in the patent of an embodiment of the claimed invention which uses non-human TET enzymes lacking a homology of at least 70% with human TET1, TET2, or TET3 to convert 5mC to 5hmC.[5] To the contrary, the specification repeatedly states that the invention is directed to the enzymatic activity of "the TET family of proteins" or "TET family proteins," which the parties agree are defined as human TET1, TET2, TET3, and CXXC4 and proteins having at least 70% homology to human TET1, TET2, or TET3. *See, e.g.*, '213 patent, col. 12, ll. 26-33; *id.*, col. 13, ll. 52-55; *id.*, col. 13, ll. 62-67; *id.*, col 24, ll. 43-50; *see also Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1290 (Fed. Cir. 2009) (district court did not err in limiting the term "crystalline" to "Crystal A" where the intrinsic record "evince[d] a clear intention to limit the '507 patent to Crystal A"); *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004) ("[W]hile the specification does not contain any statements of explicit

---

[5] Plaintiffs do not suggest that the murine enzymes disclosed in the specification (which share "significant sequence homology" to human TET enzymes, '213 patent, col. 10, ll. 19-21) lack at least 70% homology to human TET1, TET2, or TET3. *See* Pls.' Opening Br. at 19; Pls.' Resp. Br. at 19. They cite only to the murine enzymes to support the separate point that "TET family protein" includes non-human proteins having at least 70% homology to human TET1, TET2, or TET3. *See* Pls.' Opening Br. at 9-10; Pls.' Resp. Br. at 8.

disavowal or words of manifest exclusion, it repeatedly, consistently, and exclusively uses 'group' to denote fewer than all subscribers, manifesting the patentee's clear intent to so limit the term."). The parties agree, moreover, that the patentee used at least three different terms – "TET1, TET2, TET3, CXXC4," "a TET family enzyme," and "TET family protein" – interchangeably to refer to the same group of enzymes. Given the patentee's rather lax usage of words, it is not a huge leap to infer that a fourth term carries the same meaning – especially here, where the term is almost identical to the others.

In sum, the court finds defendant's construction more consistent with the intrinsic record. A "ten eleven translocation (TET) enzyme" is "the sequences of human TET1, TET2, TET3, and CXXC4, and proteins having at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, at least 95%, at least 98%, at least 99%, or more, homology to human TET1, TET2, or TET3, and displaying a catalytic (hydroxylating) activity of the TET family of protein."

### *"methylcytosine dioxygenase" or "dioxygenase enzyme or fragment thereof" or "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof"*

As with "a ten eleven translocation (TET) enzyme," the main dispute between the parties with respect to "methylcytosine dioxygenase,"

12

"dioxygenase enzyme or fragment thereof," or "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof"[6] is whether the terms are limited to human TET1, TET2, TET3, CXXC4, or proteins with at least 70% homology to human TET1, TET2, or TET3.  For the reasons discussed above, the court concludes that the answer is yes.  The court accordingly adopts defendant's construction.

*"label[]"*

Plaintiffs construe "label[]" as "adding a molecule for downstream analysis or detection purposes."  Defendant, for its part, argues that the patentee defined the term in the specification as "a composition capable of producing a detectable signal indicative of the presence of the target."

The court agrees with defendant that this is another instance where the patentee intended to act as his own lexicographer.  Using the same language the court found definitional above – "as used herein" and "refer to" – the specification states that "[t]he terms 'label' or 'tag,' as used herein, refer to a

---

[6] The term "dioxygenase enzyme or fragment thereof that is a TET family enzyme or fragment thereof" incorporates the definitions of "dioxygenase enzyme or fragment thereof" and "TET family enzyme."  A fragment of a "TET family enzyme" is exactly what it sounds like – a fragment of a protein having the sequences of human TET1, TET2, TET3, and CXXC4 or at least 70% homology to human TET1, TET2, or TET3.  Plaintiffs offer no reasonable basis for importing a completely different term – "TET catalytically active fragment" – into the mix to define "fragment thereof."

13

composition capable of producing a detectable signal indicative of the presence of the target, such as, for example, a 5-hydroxymethylcytosine, in an assay sample." '213 patent, col. 67, ll. 15-18; *see also Thorner*, 669 F.3d at 1365; *Parkervision*, 88 F.4th at 976.

The court's inquiry is not, however, at an end. The parties appear to dispute (in substance, if not in name) what it means to produce a detectable signal. Does an added glucose molecule need to be radiolabeled (or similarly marked) for identification? Or is it enough that the glucose molecule, although not physically altered, nonetheless "signals" the presence of 5hmC (because only 5hmC and not 5mC will interact with glucose molecules)?

The second interpretation appears to be more consistent with the intrinsic record than the first.[7] Claim 1 of the '053 patent, for example, is directed to a method of "labeling" 5hmC in nucleic acid by glycosylating a hydroxyl group on hydroxymethylated residue. Claim 2, which depends from claim 1, adds the further limitation that the hydroxyl group be glycosylated by means of "a modified glucose." '053 patent, cl. 2. If labeling

---

[7] The court expresses no opinion regarding enablement or written description if, as defendant asserts, "radiolabeling provided the *only* way to distinguish labeled 5hmC (5ghmC) from 5mC in a nucleic acid sample" as of the priority date of the patent. Def.'s Resp. Br. at 5 (footnote omitted).

14

does not cover adding unmodified glucose, claim 1 carries the same scope as claim 2, rendering the additional limitation superfluous.

It is true, as noted above, that the doctrine of claim differentiation may be defeated by contrary language in the specification. *See Seachange Int'l*, 413 F.3d at 1369. Here, however, the specification *also* favors construing labeling to include adding an unmodified glucose. The patent describes using glucose molecules to label 5hmC and specifies that only in "some embodiments" is the glucose molecule radiolabeled. *See* '213 patent, col. 33, ll. 39-46; *id.*, col 33, ll. 58-67; *id.*, col. 35, ll. 35-38. When defining the term, moreover, the patentee clarified that labels may include "radioisotopes, nucleotide chromophores, enzymes, substrates, fluorescent molecules, chemiluminescent moieties, magnetic particles, bioluminescent moieties, and the like" – any composition, in other words, that is "detectable by spectroscopic, photochemical, biochemical, immunochemical, electrical, optical or chemical means." *See id.*, col. 67, ll. 18-24.

### *"sequencing said mammalian nucleic acid comprising said labeled hydroxymethylated residue" or "sequencing said nucleic acid sequence"*

Plaintiffs propose construing "sequencing said mammalian nucleic acid comprising said labeled hydroxymethylated residue" or "sequencing said nucleic acid sequence" to mean "ascertaining the nucleotide sequence of

the modified mammalian nucleic acid in order to identify the position of the 5-hydroxymethylcytosine residue." Defendant, for its part, argues that the proper definition is "directly sequencing the mammalian nucleic acid having a labeled hydroxymethylated residue."

At its core, the dispute between the parties is whether the sequencing steps must be performed directly on the modified nucleic acid having the 5hmC residue or whether the nucleic acid may be amplified and the sequencing performed on an amplicon. Based on the express disclosure of sequencing after PCR amplification in the specification, *see, e.g.*, '213 patent, col. 29, ll. 62-65; *id.*, col. 84, ll. 33-35; *id.*, col. 84, ll. 55-56, the court finds plaintiffs' interpretation more consistent with the intrinsic record.

Defendant's sole argument in favor of a contrary construction is premised on the prosecution history of a related patent. In 2019, plaintiffs proposed amending claim 1 of the '053 patent as follows:

> A method comprising:
>
> (a) labeling covalently, a hydroxyl group on a 5-hydroxymethylcytosine residue in mammalian nucleic acid to generate a labeled hydroxymethylated residue, where said labeling comprises glycosylating the hydroxyl group by employment an alpha-glucosyltransferase, a beta-glucosyltransferase, or a beta-glucosyl-alpha-glucosyl-transferase; and
>
> (b) sequencing said mammalian nucleic acid <u>or an amplicon thereof</u> <s>comprising said labeled hydroxymethylated residue</s>.

16

Gately Decl. [Dkt # 102], Ex. 1.  The Examiner disapproved the proposed amendment, stating that "[t]he amendments to claim 1 broaden the scope of the claim as step (b) would not depend on the performance of step (a) as amended."  *Id.*  Plaintiffs did not contest this disapproval.

Defendant views plaintiffs' failure to object as a waiver of claim scope.  But "[a] patentee is not required to fight tooth and nail every possibly adverse thought an examiner commits to paper."  *TorPharm, Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003).  Where, as here, the Examiner's ruling did not actually alter the scope of the claim – the disapproval merely had the effect of keeping the language of claim 1 of the '053 patent as originally issued – the court is not convinced that the failure to proactively pursue an amendment demonstrates any intent to cede claim scope.

## ORDER

The claim terms at issue will be construed for the jury and for all other purposes in the pending litigation in a manner consistent with the above rulings of the court.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE